UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
**ERIC E. PAQUETTE, as Personal**           )
**Representative of the Estates of**        )
**Shirley J. Ju and Chester Ju,**           )
                                            )    Civil No.
      **Plaintiff,**    )    14-12377-FDS
                                            )
      v.                )
                                            )
**McDERMOTT INVESTMENT**                    )
**SERVICES, LLC,**                          )
                                            )
      **Defendant.**    )
_____)

**MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION TO COMPEL ARBITRATION**

**SAYLOR, J.**

      This matter involves a question of arbitrability that arises out of an employment dispute. Defendant McDermott Investment Services, LLC ("MIS"), brought an arbitration action against the personal representative of the estates of two former employees, Chester and Shirley Ju, alleging that they breached their employment contracts, breached their fiduciary duties to the company, converted property, and violated the Pennsylvania trade-secrets statute. Plaintiff Eric Paquette, as personal representative of the estates, has brought an action for declaratory judgment as to those claims and to recover commission payments that MIS allegedly owes Chester Ju.

      MIS has moved to compel arbitration under the employment contracts with the Financial Industry Regulatory Authority ("FINRA"), or alternatively with the American Arbitration Association ("AAA"). For the following reasons, the motion to compel will be granted and the action will be stayed pending arbitration.

I.      **Background**

McDermott Investment Services, LLC, is a registered broker-dealer in the securities industry that is owned solely by Dean McDermott, a citizen of Florida. The company operates primarily in Pennsylvania. Shirley J. Ju and Chester Ju were a married couple who lived in Massachusetts. They were both registered representatives in the securities industry, licensed by FINRA.

In May 2011, the Jus began working for MIS from their home office in Natick, Massachusetts. They each signed an Independent Contractor Agreement ("ICA") with MIS that included covenants to maintain confidentiality and trade secrets and to return all property relating to MIS in the event of termination.[1] In addition, each contract provided that

---

[1] As to confidentiality and trade secrets, the agreement stated as follows:

> [The independent contractor or "IC"] will not divulge, use, disclose, or furnish to anyone other than McDermott any trade secrets or other confidential information concerning McDermott. IC recognizes that IC's relationship with McDermott may give IC access to non-public, proprietary information, confidential information and trade secrets. Consequently, during the term of this Agreement and thereafter, IC shall not use for itself or for others or divulge to anyone except any person specifically designated by McDermott any such information, trade secrets, know how, or data relating to the business of McDermott, which became known to IC as a result of or during the independent contractor relationship with McDermott. IC shall use particular care to ensure that such information does not become known to those who are engaged in activities competitive with those of McDermott. Such information, trade secretas, know how or data shall include, but not be limited to, any information concerning McDermott's procedures, products, services, purchasing, accounting, marketing, selling methods or techniques, research and development, computer programs, purchasing information, ideas and plans for development, historical financial data and forecast, long range plans and strategies, customer lists and any information related to McDermott's customers, and any other such information concerning the business of McDermott or its manner of operation which is not generally known to the industry.

(Compl., Ex. A, ICA ¶ 4(d)). As to return of property, the agreement stated as follows:

> Upon termination of this Agreement or upon demand by McDermott, IC shall return to McDermott all books, records, lists, including customer lists, written material, notes, data and information relating to McDermott or its business, and all other property, which is the property of McDermott. IC shall not make or retain copies of any of these documents or other property at any time without the express, written authorization of McDermott by its duly authorized agent.

(ICA ¶ 18).

> Any and all controversies which may rise between the parties concerning the construction, performance or breach of this Agreement shall be determined by arbitration. Any arbitration under this Agreement shall be held under and pursuant to the rules of FINRA. The award of the arbitrators or a majority of them, shall be final, and judgment upon the award rendered may be entered by any court of competent jurisdiction. In the event FINRA declines jurisdiction over the arbitration, the parties agree to submit the dispute to arbitration before the American Arbitration Association. Any proceeding in court shall be maintained in United States District Court for the Eastern District of Pennsylvania or, if federal jurisdiction is not available, in state court in Northampton County, Pennsylvania.

(ICA ¶ 19). The ICAs expressly stated that the duties and obligations contained in the agreements are binding on the parties' "successors, assigns, heirs and personal representatives." (ICA ¶ 14). Each provided that Pennsylvania law governed the agreement and "any claims, controversies, or disputes arising out of or relating to" the agreement. (ICA ¶ 12).

In June 2013, Shirley Ju resigned from MIS. On September 5, 2013, she contacted Marilee Hill, an acquaintance in the Virgin Islands who worked in the same field for the investment firm Concorde Investment Services, LLC. Ju wrote to Hill: "Marilee I don't have the heart for this anymore. Do you want some of my clients[?]" (Compl. ¶ 46). In October 2013, she sent Hill several e-mails identifying a subset of her clients. Plaintiff contends that Ms. Ju had begun providing services for these clients prior to her affiliation with MIS. (Compl. ¶¶ 47-48).

At some point prior to the fall of 2013, the Jus filed for divorce. (Compl. ¶ 44). On November 2, 2013, Chester Ju murdered Shirley Ju and then committed suicide. (Compl. ¶ 50). Shirley Ju's son, Eric Paquette, was appointed personal representative of their estates. (Compl. ¶ 1). He took responsibility for their house and affairs, including the business papers in their home office—most of which, he alleges, he discarded. (Compl. ¶¶ 51-52).

On November 6 and November 12, 2013, a lawyer for Dean McDermott of MIS

3

contacted Chester and Shirley Ju's daughter, Nicole, to request various files and documents allegedly stored in their home. (Compl. ¶¶ 54-57, 60-61; Pl. Mem., Exs. A, B). Paquette spoke with the attorney on December 2, 2013, and sent whichever files he had preserved to the lawyer. (Compl. ¶¶ 67-69). He later arranged for access to the Jus' computers, which were in the custody of the Massachusetts State Police. (Compl. ¶¶ 74-77). At some point, the lawyer informed Paquette that Chester Ju had earned unpaid commissions of more than $20,000. Paquette provided MIS an original copy of Chester's death certificate and of Paquette's appointment as personal representative in an effort to obtain that money. (Compl. ¶ 79).

On January 23, 2014, MIS filed a claim with the FINRA dispute resolution board against Paquette (as personal representative of Chester and Shirley Ju), Marilee Hill, and Concorde Investment Services. (Def. Mem., Gold Aff., Ex. C; Pl. Mem., Andrichik Aff.). MIS essentially contended that Shirley Ju had improperly disclosed client lists and confidential information to Hill and that Chester Ju had failed to protect that information and therefore aided and abetted Hill and his wife. MIS brought claims for breach of contract, breach of fiduciary duty, conversion, and violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA"). It also brought a claim for "turnover of property," requesting that FINRA "order Shirley's estate and Chester's estate to immediately return to MIS all of its property." (Def. Mem., Gold Aff., Ex. C).

On March 19, 2014, FINRA informed Paquette that MIS had filed a claim but stated that he would "not [be] required to arbitrate disputes in the FINRA arbitration forum." (Pl. Mem.,

4

Ex. C).² On May 7, 2014, Paquette responded by letter that he did not voluntarily submit to its arbitration. (Gold. Aff., Ex. D). On May 13, 2014, Bonnie Simon wrote a letter to MIS's attorney stating the following:

> The arbitration panel will only have the power to render an enforceable award against [the Estate of Shirley Ju] if [the Estate] agrees to submit voluntarily to FINRA's jurisdiction. In the absence of such a voluntary submission, FINRA has no alternative except to proceed with this action without the participation of [the Estate] and to advise you to pursue remedies against [the Estate] in another forum which does have jurisdiction.

(Gold Aff., Ex. E). Simon later stated in response to an e-mail from that attorney that "[p]ursuant to FINRA procedures and guidelines, FINRA will not accept a claim against a deceased [Associated Person] or his/her estate." (Gold Aff., Ex. F).³ However, Simon later indicated to the attorney that FINRA would exercise jurisdiction over the claims involving the estates if a court granted a motion to compel arbitration. (Gold Aff. ¶ 4; Andrichik Aff. ¶ 13). According to the attorney, the AAA has represented that it would accept a claim involving an estate. (Gold Aff. ¶ 5).

In April 2014, MIS filed notices of creditor's claims with the Middlesex Probate Court, asserting damages of at least $604,800 from Shirley Ju's estate and $666,900 from Chester Ju's estate. (Compl. ¶ 98; Pl. Mem., Ex. D).

On May 7, 2014, Paquette filed a complaint in state court seeking a declaratory judgment

---

² Kenneth Andrichik, Senior Vice President, Chief Counsel, and Director of Mediation and Strategy at FINRA Dispute Resolution, has explained that "[b]ecause the Estate is not a natural person registered with FINRA, Dispute Resolution determined that the estate was not required to arbitrate the claims against it in the Dispute Resolution Forum." (Andrichik Aff. ¶ 10).

³ FINRA's Code of Arbitration Procedure for Industry Disputes defines "Person Associated with a Member" or "Associated Person" as "[a] natural person who is registered or has applied for registration under the Rules of FINRA." FINRA Rule 13100(a), ®, *available at* http://finra.complinet.com. (*See* Andrichik Aff., Ex. B). A "Member" is "any broker or dealer admitted to membership in FINRA . . . ." FINRA Rule 13100(o).

5

with respect to each of MIS's claims against the Jus. The complaint also included a claim for the $20,000 in unpaid commissions allegedly owed to Chester Ju by MIS. On June 4, 2014, MIS removed the case to this Court on the basis of diversity jurisdiction. It then moved to stay these proceedings and compel arbitration.

## II. Legal Standard

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, governs the enforcement of written arbitration agreements. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) (holding that the FAA extends to employment cases for employees other than those engaged in transportation). It was enacted in order to reverse longstanding judicial hostility to arbitration agreements and to "place such agreements upon the same footing as other contracts." *Allied–Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 271 (1995) (internal quotation marks and citation omitted); *accord AT & T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1745-46 (2011). When "construing an arbitration clause, courts and arbitrators must give effect to the contractual rights and expectations of the parties." *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (internal quotation marks and citation omitted). The Act promotes "a liberal federal policy favoring arbitration agreements" and "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

"A party who is seeking to compel arbitration must demonstrate that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." *Soto-

6

*Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011) (internal quotation marks and citation omitted). "When an enforceable arbitration agreement exists between the parties, a court may enforce that agreement by staying existing litigation pending arbitration of the parties, 9 U.S.C. § 3, or compelling the parties to arbitrate, 9 U.S.C. § 4." *DeLuca v. Bear Stearns & Co.*, 175 F. Supp. 2d 102, 106-07 (D. Mass. 2001).

**III.    Analysis**

Defendant has moved to compel arbitration and stay proceedings pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3 and 4, and paragraphs 19 of the ICAs. It seeks arbitration before FINRA or, in the alternative, the AAA. Plaintiff opposes the motion, contending that Massachusetts law requires all creditor claims against estates to be adjudicated in a court of law.[4] Plaintiff contends in the alternative that, even if Massachusetts law allows arbitration of some claims against estates, the specific language of the ICA forecloses arbitration of at least some of MIS's claims.

**A.    Whether the Massachusetts Probate Code Prohibits Arbitration**

The threshold question is whether Massachusetts law requires that the claims of creditors against estates be adjudicated in a court of law rather than in an arbitration forum. Under the newly enacted Massachusetts Uniform Probate Code, "[c]laims against a decedent's estate shall be commenced by a proceeding against the personal representative in any court where the personal representative may be subjected to jurisdiction, to obtain payment of his claim against

---

[4] The original state-court complaint filed by Paquette included six counts seeking a declaratory judgment with respect to the claims of MIS against the estates. Thus, if plaintiff is correct that Massachusetts law bars arbitration of claims against estates, those claims are not arbitrable. By contrast, plaintiff's claim for unpaid commissions is a claim *by* an estate, rather than *against* an estate. The arbitrability of that claim depends solely on the arbitration clause itself. The Court addresses the scope of the arbitration clause below.

7

the estate . . . ." Mass. Gen. Laws ch. 190B, § 3-804(2). Plaintiff asserts that the statute's reference to "court" precludes arbitration of a claim by or against an estate. For multiple reasons, that argument fails.

Read as a whole, the reference in the Massachusetts probate code to commencing a proceeding in a "court" should not be read to exclude the possibility that a creditor of an estate could commence an arbitration proceeding against the estate. First, the probate code elsewhere provides that personal representatives of an estate and creditors may settle their claims by arbitration. *See, e.g.*, Mass. Gen. Laws ch. 190B § 3-809(2) (providing that a creditor with a secured claim and a personal representative may determine the amount of the allowed claim "by agreement, arbitration, compromise or litigation"). Second, the statutory language on its face applies only to claims against an estate, not claims on behalf of an estate; it would be anomalous, to say the least, if an estate could assert a claim in arbitration, but not be required to defend an arbitration counterclaim arising out of the same set of facts. Third, the apparent purpose of § 3-804 is to ensure prompt adjudication of claims by imposing a time limitation and a notice requirement; it is not to dictate precisely where or how those claims must be presented. *See Gates v. Reilly*, 453 Mass. 460, 466 (2009) (stating that the purpose behind the nearly identical language in Mass. Gen. Law ch. 197, § 9(a)—the predecessor to 3-803(a)—was to "expedite the settlement of estates"); 31 Am. Jur. 2d Executors and Administrators § 605 (2014) ("While it is important that the four-month limit on filing of claims be strictly observed in order to encourage the speedy disposition of estates, it is not as important that the required manner of giving notice

of a claim be strictly followed.").[5]

Perhaps most importantly, Massachusetts law, like federal law, strongly favors arbitration. *See* Mass. Gen. Law ch. 251, § 1 *et seq.*; *St. Fleur v. WPI Cable Sys./Mutron*, 450 Mass. 345, 349 (2008) ("Similar to the Federal Act, the Massachusetts Act express[es] a strong public policy favoring arbitration." (internal quotation marks and citation omitted)).[6] It is therefore highly unlikely that the Legislature intended to preclude arbitration of all probate-related claims or that it would do so without being more explicit.[7]

Finally, and in any event, if the Massachusetts probate code mandated adjudication in a court of law rather than before an arbitration panel, the FAA would likely preempt that provision. Section 2 of the FAA prevents states from imposing "limitations which are special to arbitral clauses." *Bezio v. Draeger*, 737 F.3d 819, 823 (1st Cir. 2013). A state cannot require that parties utilize a judicial forum to resolve claims that parties agreed to adjudicate by arbitration. *Southland Corp. v. Keating*, 465 U.S. 1, 10-11 (1984); *PaineWebber Inc. v. Elahi*, 87 F.3d 589, 592-93 (1st Cir. 1996) ("[I]f a state law is applicable to contracts generally, it may be applied to arbitration agreements, but a state law that is specifically and solely applicable to arbitration agreements is displaced by the FAA."). Thus, while the FAA does not completely

---

[5] Here, plaintiff clearly received timely notice of defendant's claims against the estate. And referral to arbitration, which has been described as an "expeditious alternative to litigation for settling commercial disputes," *Town of Danvers v. Wexler Const. Co., Inc.*, 12 Mass. App. Ct. 160, 163 (1981), will serve the statutory purpose of prompt adjudication of claims.

[6] Pennsylvania law is to the same effect. *See* 42 Pa. Cons. Stat. § 7303 *et seq.*

[7] The parties to the agreement have themselves expressed a preference for arbitration. Paragraph 14 of the ICA specifically provides that its duties and obligations are binding on personal representatives. It is noteworthy that the version of the probate code in effect at the time that the parties entered into the ICAs explicitly provided that the courts could authorize the executor of an estate "to adjust by arbitration or compromise any demand in favor of or against the estate by him represented" and "to adjust by arbitration or compromise any controversy or question as to the administration or distribution of the estate in his possession." Mass. Gen. Laws ch. 204, §§ 13, 14 (2010) (repealed); *see Harhay v. Starkey*, 2010 WL 1904874, at *6 n.3 (D. Mass. May 10, 2010).

preempt the field of arbitration, it does override state statutes that purport to refer particular types of claims to judicial or administrative bodies. *Preston v. Ferrer*, 552 U.S. 346, 349-50 (2008); *Sec. Indus. Ass'n v. Connolly*, 883 F.2d 1114, 1117-18 (1st Cir. 1989); *Joule, Inc. v. Simmons*, 459 Mass. 88, 98-100 (2011). A statutory requirement that all claims against estates may only be adjudicated in a judicial forum, to the exclusion of arbitration, would run afoul of the FAA's plain text and purpose. *See AT & T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1747 (2011) ("When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA."); *Marmet Health Care Center, Inc. v. Brown*, 132 S.Ct. 1201, 1203 (2012) (*per curiam*). Rather than interpret the probate code in a manner that would contravene federal law, the more reasonable conclusion is that the statute's reference to commencing a proceeding in a "court" does not preclude the possibility that an estate could commence, or be required to defend, an arbitration proceeding.

In sum, the most sensible and plausible reading of § 3-804 is that it requires timely presentation of a claim and commencement of an action, but does not preclude arbitration of claims by or against an estate.

### B. Whether the Parties Agreed to Arbitrate the Claims

Prior to compelling arbitration under the FAA, "a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009). While there is a presumption in favor of arbitration, that presumption "does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Id.*

#### 1. Agreement to Arbitrate

The parties do not dispute that the Jus and MIS agreed to arbitrate, and the ICAs

specifically provide that they will be binding on the parties' "successors, assigns, heirs and personal representatives." (ICA ¶ 14). *See Entrekin v. Internal Med. Associates of Dothan, P.A.*, 689 F.3d 1248, 1254 (11th Cir. 2012) ("[A]n executor is bound by the same contracts that bound the decedent while she was alive, including an arbitration agreement."); *Wilkerson ex rel. Estate of Wilkerson v. Nelson*, 395 F. Supp. 2d 281, 288-89 (M.D.N.C. 2005) (requiring arbitration by estate where agreement specifically states that it is binding on estate and estate's claim is legally derivative of decedent); *Peltz ex rel. Estate of Peltz v. Sears, Roebuck & Co.*, 367 F. Supp. 2d 711, 718 (E.D. Pa. 2005) (requiring that estate arbitrate under contract to which decedent had agreed). Nor does plaintiff argue that the ICAs or the arbitration clauses in particular are otherwise invalid—for example, on grounds of fraud, duress, or unconscionability. *See Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 84-85 (3d Cir. 2010) (applying general principles of contract law to determine enforceability of arbitration clause); *Gay v. CreditInform*, 511 F.3d 369, 394 (3d Cir. 2007); *St. Fleur*, 450 Mass. at 349-50 (recognizing that agreements to arbitrate are subject to the same defenses as other contracts). Thus, it appears that there is no question that the agreement to arbitrate is valid. The only question is whether the claims at issue come within the ambit of the arbitration clause. *See CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 172 (3d Cir. 2014).

### 2. Scope of Arbitration Agreement

Plaintiff concedes that defendant's claims for breach of contract and turnover of property both fall within the ambit of the arbitration clause. Both of these claims indisputably "concern[] the construction, performance or breach" of the ICA. (ICA ¶ 19). Plaintiff's claim for allegedly unpaid commissions to Chester Ju also fits this language, as any commissions owed to Mr. Ju

11

would directly result from his "performance" under the ICA.[8] The motion to compel arbitration will therefore be granted with respect to at least these claims.

Plaintiff disputes the arbitrability of MIS's remaining claims—that is, those for breach of fiduciary duty, conversion, and violation of the PUTSA. Plaintiff contends that while the language of the arbitration clause mandates arbitration of contract claims, it does *not* apply to associated tort claims. Further, plaintiff contends that Pennsylvania's "gist-of-the-action" doctrine bars defendant from re-categorizing those claims as contract claims.

The question of "whether a particular dispute is within the class of those disputes governed by the arbitration clause . . . is a matter of federal law." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009). "In determining whether the particular dispute falls within a valid arbitration agreement's scope, 'there is a presumption of arbitrability[:] an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Id.* (quoting *AT & T Technologies, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)). In other words, if the contract is ambiguous as to whether arbitration is mandatory, the federal policy favoring arbitration applies. *Battaglia v. McKendry*, 233 F.3d 720, 725 (3d Cir. 2000); *Renfrew Centers, Inc. v. UNI/CARE Sys. Inc.*, 920 F. Supp. 2d 572, 575-77 (E.D. Pa. 2013). However, "the fact that the parties have agreed to arbitrate some disputes does not necessarily manifest an intent to arbitrate every dispute that might arise between the parties . . . ." *CardioNet, Inc.*, 751 F.3d at 172. "[W]hether a dispute falls within the scope of an arbitration clause depends upon the relationship between

---

[8] Plaintiff did not address the arbitrability of the claim for unpaid commissions in his motion papers.

(1) the breadth of the arbitration clause and (2) the nature of the given claim." *Id.*

The use of phrases such as "arising under" or "arising out of" in an arbitration provision generally indicates an intent to arbitrate a broad scope of claims. *Battaglia*, 233 F.3d at 727; *see Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324, 330 (E.D. Pa. 2004); *see, e.g.*, *Century Indem. Co.*, 584 F.3d at 556 (broadly construing a provision requiring arbitration of "any dispute with reference to the interpretation of this Agreement or [the parties'] rights with respect to any transaction involved"); *Medtronic AVE Inc. v. Cordis Corp.*, 100 Fed. Appx. 865, 868–69 (3rd Cir. 2004) (compelling arbitration of "broad" clause that governed "any dispute, claim, or controversy arising from or relating to this Agreement or alleged breaches thereof"); *Peltz*, 367 F. Supp. 2d at 717-18 (broadly construing an agreement that "[a]ny and all claims . . . of any nature whatsoever (whether in contract, tort, or otherwise, including statutory . . . claims) arising out of, relating to, or in connection with (1) this Agreement, [or] (2) the relationships which result from this Agreement . . ."). In contrast, an agreement to arbitrate only disputes "regarding the performance or interpretation" of the contract is normally relatively narrow in scope. *CardioNet, Inc.*, 751 F.3d at 173-74.

The provision at issue here—an agreement to arbitrate "[a]ny and all controversies which may rise between the parties concerning the construction, performance or breach of this Agreement"—does not use the sweeping language often found in arbitration agreements. But neither does it clearly limit arbitration to a narrow subset of claims. On the spectrum of breadth of arbitration clauses, the provision falls toward the broader end. The listing of "construction, performance or breach" must add some limitation, of course. But other courts have categorized nearly identical provisions as relatively broad. *See, e.g.*, *Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324, 330 (E.D. Pa. 2004) ("[The] arbitration clause is broad on its face, governing 'any

dispute, controversy or claim aris[ing] in connection with the performance or breach of this Agreement.'"); *Spaz Beverage Co. Defined Ben. Pension Plan v. Douglas*, 2011 WL 3359749, at *5 (E.D. Pa. Aug. 4, 2011) (interpreting broadly clause mandating arbitration of disputes "concerning any order or transaction, or the continuation, performance or breach of this or any other agreement between us"). The presumption of arbitrability is therefore strong. Only a clear indication that the parties did not intend arbitration of a particular claim will preclude arbitration.

The gist-of-the-action doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] preclud[ing] plaintiffs from recasting ordinary breach of contract claims into tort claims." *Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 619 (E.D. Pa. 2010) (quoting *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002)). That is, while a contractual claim does not preclude one party from bringing a tort claim against another, a party cannot pursue a tort action "for the mere breach of contractual duties, without any separate or independent event giving rise to the tort." *Cola*, 745 F. Supp. 2d at 619 (internal quotation marks and citation omitted).

Under plaintiff's theory, defendant's claims for breach of fiduciary duty, conversion, and violation of the PUTSA must either be tort claims (in which case they are not arbitrable under plaintiff's reading of the arbitration clause) or contract claims (in which case they are barred by the gist-of-the-action doctrine). However, the arbitration clause is not as narrow as plaintiff contends. It does not strictly limit itself to contract claims, but plausibly covers causes of action that stem from the relationship created by the contract. At the very least, the agreement is ambiguous as to whether claims relating to fiduciary duty, conversion, and disclosure of trade secrets that arise out of the "performance" of the ICA are arbitrable. *See Bannett v. Hankin*, 331 F. Supp. 2d 354, 360 (E.D. Pa. 2004) ("When determining whether a given claim falls within the

14

scope of an arbitration agreement, a court must focus on the factual allegations in the complaint rather than the legal causes of action asserted." (internal quotation marks and citation omitted)); *Spaz Beverage Co. Defined Ben. Pension Plan*, 2011 WL 3359749, at *5 (compelling adjudication of fiduciary-duty claim); *see also Am. Fin. Capital Corp. v. Princeton Elec. Prods.*, 1996 WL 131145, at *9 (E.D. Pa. Mar. 20, 1996) ("[I]n order to 'arise under' an agreement, a claim need not be identifiable as an issue explicitly covered by the agreement, but merely must be engendered by virtue of the relationship the agreement established or otherwise addressable by reference to the duties and obligations set out in the agreement."). Indeed, the ICA explicitly addresses confidentiality, trade secrets, and fiduciary duty. Applying the federal policy that ambiguities in arbitration clauses should be resolved in favor of arbitration, it is clear that the motion to compel should be granted. Whether, in fact, the claims for breach of fiduciary duty, conversion, and violation of PUTSA are duplicative of the contract claims is a ruling on the merits that this Court cannot and should not make at this time.

Accordingly, defendant's motion to compel arbitration will be granted with respect to all claims and the case will be stayed pending a decision by the arbitration panel pursuant to 9 U.S.C. §§ 3 and 4.

### C. <u>Who Should Arbitrate the Dispute</u>

The ICA provides that FINRA should arbitrate any dispute unless it "declines jurisdiction," in which case the AAA should arbitrate the dispute. This raises the question of whether FINRA has "declined jurisdiction" in this case.

Plaintiff contends that FINRA does not even *have* jurisdiction over the estates, and that it has acknowledged as much to the parties. Plaintiff concludes that FINRA has thus not technically "declined jurisdiction," and therefore the clause of the ICA re-routing the dispute to

the AAA does not apply, and neither FINRA nor the AAA may arbitrate the dispute. Because the Court has determined that the case is subject to arbitration, plaintiff's conclusion is illogical. Instead, unless FINRA clearly lacks jurisdiction, it should be given an opportunity to decide whether to accept or decline jurisdiction.

Initially, FINRA declined to require plaintiff to submit to arbitration because he represents an estate, as opposed to a natural person, but it did indicate that he could submit voluntarily. Later, FINRA clarified that it would hear defendant's claims against plaintiff if a court ordered that plaintiff "is required to submit to arbitration . . . ." (Andrichik Aff. ¶ 13).

FINRA has the authority to interpret its own rules. *See Fantastic Sams Franchise Corp. v. FSRO Ass'n Ltd.*, 683 F.3d 18, 25 (1st Cir. 2012); FINRA Rule 13413 ("The panel has the authority to interpret and determine the applicability of all provisions under the Code."). Although a FINRA official described itself as lacking "jurisdiction" to consider the matter, the record as a whole suggests that its use of that term was not strict or legally precise. Its refusal appears more a choice based in policy than law. In fact, FINRA's chief counsel has indicated that it would hear this dispute, implying therefore that it does not lack jurisdiction over the matter. Moreover, there appears to have been at least one other instance in which FINRA adjudicated claims against an estate, *see Klatte v. Buckman, Buckman & Reid, Inc.*, 2014 WL 3344449, at *1-2 (D.N.J. July 8, 2014) (describing that "[w]hile the parties were arbitrating their claims against Mr. Demers' estate and Mercer Capital before FINRA, the probate of Mr. Demers' estate continued in Minnesota state court"), and multiple instances of adjudication of claims by estates, *see Smith Barney, Inc. v. Henry*, 775 So. 2d 722 (Miss. 2001); *Jansen v. Salomon Smith Barney*, 776 A.2d 816 (N.J. App. Div. 2001); *Collins v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 561 So.2d 952 (La. App. 4th Cir. 1990).

16

Having determined that arbitration is warranted, this Court leaves the determination of whether to hear the dispute or to decline to hear the dispute to FINRA. If FINRA decides that it will not arbitrate the matter, then the ICA appears to provide for arbitration before the AAA, which has already indicated that it would do so. (*See* Gold Aff. ¶ 5). Whether the AAA will do so is, in any event, a question for that body, not for the Court. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002) (stating that an arbitrator shall decide whether a condition precedent to arbitrability has been met); *Fantastic Sams Franchise Corp.*, 683 F.3d at 25.[9]

## IV. Conclusion

For the foregoing reasons, defendant's motion to compel arbitration is GRANTED, and the case is STAYED pending the result of the arbitration process.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: October 17, 2014

---

[9] Because the Court finds that arbitration is required under the contracts, it need not decide whether principles of equitable estoppel would also require arbitration, as defendant argues.